Our third case for argument this morning is Johnson v. Marian University. Get the plaintiff right. Mr. Biddle. Good morning, Your Honors, and may it please the Court. In weighing evidence, first of all, I would like to reserve two minutes for rebuttal. In weighing evidence in a discrimination case, all evidence belongs in a single pile and must be evaluated as a whole. That was the explicit instruction of this Court in Ortiz, an instruction that has been repeated in Barbera and most recently in Jaw v. Villa Parizzo Community Schools. Yet the District Court declined to follow that rule when it granted summary judgment to Marian University in this Title IX case. Indeed, it flipped the summary judgment standard on its head when it drew inferences in favor of the moving party and found that the former student, Trevor Johnson, had not produced sufficient evidence of sex-based discrimination arising from the University's wrongful and biased determination that he was responsible for nonconsensual sexual conduct with another student. As the Ortiz Court recognized, some discrimination cases permit easy inferences such as the fabled employer who admits to firing an employee because of race. But few discrimination cases are so straightforward. Indeed, they are often factually complex and require sifting through ambiguous pieces of evidence. The University all but ignores the admonitions of Ortiz and Barbera in its brief as did the District Court in its opinion. Here, Mr. Johnson produced sufficient evidence to survive summary judgment and showed that Marian University and its employees discriminated against him because he is a male. The District Court granted summary judgment only when it made factual findings and considered each piece of evidence in a vacuum rather than weighed together. For instance, while the District Court and the University tacitly acknowledge the apparent bias of Dr. Kreekow, who was the Deputy Title IX Coordinator and the lead investigator in this case, they argue that it was based on Mr. Johnson's status as a respondent rather than his status as a male. But because of Dr. Kreekow's tweets, because of the trainings, and because of the other evidence that's in the summary judgment record, Mr. Johnson has satisfied his obligation to produce a particularized something more that this Court recognized in the Doe v. Perdue case in linking sex-based discrimination to the University's other procedural failings and incentives for discrimination. Counsel, I'm not sure I understand the theory that Kreekow's position about the Kavanaugh nomination shows any kind of bias. Suppose a district judge in sentencing one defendant believes a victim's claim that she had been sexually assaulted. Would you argue that that prevents the judge from sentencing any other defendant charged with sexual assault because he's revealed a bias in favor of asserted victims? No, Your Honor. I would certainly not make— So then why is this different? Dean Kreekow says, I believe Ms. Ford. That's fine, but how does that show bias? Your Honor, the reason that it's bias, especially when you take the Ortiz test and weigh it together with all the other evidence, is because of the timing and because of the gendered language that he uses in the tweets. And specifically, when you look at tweets that say that Kavanaugh didn't offer a word of sympathy or concern for the women who have been sexually harassed or abused. And district judges say that kind of thing about criminal defendants all the time. They do, Your Honor. Without, I think, being subject to a contention that that shows they're biased and therefore have to stop hearing that category of cases. Your Honor, of course, the biggest difference there is when a district court judge does that, it's in the course of that district court judge's duties. It's not something that a district court judge would normally officiously do, just go out and put it on Twitter. And especially when it's something where. What difference does it make whether the statement is made on the record in a court or at Twitter? Once you accept the principle that the statement, I believe X over Y, where X is somebody who claims to be a victim of sex discrimination or sexual assault. Once you accept the principle that believing X over Y does not disqualify a person for bias in a future similar case, I don't understand how Dean Krikow can be viewed to be universally biased. Your Honor, because this is something that is so in the public sphere, and when you look at that with the other external. Everything that happens in court is in the public sphere. It's an official action. And the result is that somebody goes to jail for years. There's no more official action than that. Yes, Your Honor. And that certainly is an official act of a court. In this case, when you're a Title IX coordinator and you are the judge, jury, and inquisitor, as Dr. Krikow was here, then it's extremely important to maintain some impartiality, something that district court judges would, of course, always be encouraged to do with extrajudicial statements. This would be the same as an extrajudicial statement that could bear on his bias. And that's especially true when you look at the fact that the tweets bookend the Johnson proceedings. On one end, you have just days before the allegations are made against the student, you have the Kavanaugh tweets. And then you have the tweet directly from Dr. Krikow that comes right afterwards, where he is addressing someone specifically who is making an allegation about someone alleging harassment. When he says, a woman states that she has to be selective in what harassment she speaks out about, and this cat, referring to the critic, feels that he needs to speak up and tell her the issue. Take a seat because a hit dog hollers. This is the specific gendered language that we look at in the cases right now that specifically say that you need to have some evidence that ties in the specific decision makers at the university to the particular context. And in order to just a second, was was there any you mentioned the word timing? Yes, there are any issue about the fact that this came up one year after the encounter. Your Honor, I think that is something that certainly goes to the credibility of the complainant and in the fact that she was so readily believed by the investigators. And we have that rather difficult language from Dr. Krikow in the initial investigation where it's very clear he's believing her one year after she makes the allegation. So I think that is important in showing the bias in this case and that the university's supposedly non-gender reasons for their decision are simply pretextual. Well, it seems that one of the main issues that I guess the examiners came up with was the fact that the morning after, so to speak, he wonders if she remembers what happened last night. And that seemed to have a lot of bearing on decision. And that's why I was wondering what took so long to get around to raising this a year later. I just I don't know. Maybe this is just not was not presented. And it's been arguing that discriminated because he was a male, not because, let's say, another. What do you want to call the guy, the guy who's the fiance, the fiance and Johnson, I guess, had a pretty physical encounter at some point, each of them holding guns. Your Honor, there's there's deposition testimony from that that I think is not necessarily material and and is contested. So it's probably not because it wasn't really raised is why this whole thing came down later on. I mean, I'll ask your other side on that. But in any event, we're focused here strictly on whether or not he was discriminated against because he was a male. Yes, sir. That he and Doe Rowe had the same opportunity to say whatever happened. And you're saying, well, you're perceiving what. Yeah, but he got nailed because he was a male. And I'm looking more at what the timing was and what really happened and interim relationships and other things that seemed to intercept whatever the effect of this encounter. That's right. And there's a lot that that intervenes in that in that one year. That is ample reason for for doubting the account of the accuser in this case, which is why it's particularly troubling that in the initial intake interview, Dr. And the the record here shows ample evidence that it's simply because he's a male, not just a respondent. And there's enough evidence to show that into short circuit. This litigation too early to make it so that that can't be decided so that the witnesses can't be heard from was error from the district court. I see that I've I've gone over my time. If I could reserve any time for rebuttal, I'd appreciate it unless the court has any other questions. Thank you, Your Honor. Miss Tierney. Good morning. May it please the court. Danielle Tierney of Axley Brunelson appearing for the appellee and defendant, Marion University. I want to jump in a little bit on what Judge Mannion had hit on the end there, which is after looking at everything that's kind of come together. What this really boils down to is that both sides have an equal opportunity once the complaint was made to present evidence about what happened to question the evidence that was in the record. And there's simply no evidence that's been presented that the investigation was tainted in any way or changed in any way as a result of the sex of the complainant or the sex of the respondent. And in fact, Mr. Johnson actually admitted a number of things in his depositions, including that the investigation was not conducted any differently because he was a male. He admitted that the process was explained to him and applied to him in the same manner that it was applied to the complainant without any distinction to sex. He also admitted that he doesn't think he was posed any different questions or treated any I should say he wasn't posed any different questions or no different questions were asked of him simply because he was a male. And so despite all of these admissions, he now wants to cherry pick and go through and try and find something out there that suggests that his admissions aren't dispositive of the case. And in fact, there was bias. And for that, he points to the tweets, which we've just just discussed, and some comments made by Dr. Krikow during the initial intake interview. Now, with respect to the tweets, I think Judge Easterbrook correctly pointed out that, you know, this doesn't really show anything that necessarily shows an impact on this case. Mr. or Dr. Krikow, excuse me, was commenting on a national proceeding that was going on. I think one of the tweets was a retweet. One of the tweets was his original authorship. But I don't believe we're looking at the same gendered language that shows a predisposition that could be carried out or carried into the ongoing investigation. To contrast, the statement that was cited in the Doe versus Purdue case that on a motion to dismiss, not a motion for summary judgment, the court believed showed sufficient causal or showed a sufficient potential cause was that, quote, alcohol or excuse me. Yes, alcohol is not the cause of sexual assault on campus. Men are. And that I think is directly contrasted to the type of tweet that Dr. Krikow made in this situation prior to the investigation and after the investigation. He's not making a comment saying all men shouldn't be believed, all victims should be believed. He's not making a comment that men are the cause of sexual assault, as was the case in this situation. He was simply commenting on the ongoing situation with Justice Kavanaugh and Dr. Ford. There isn't this sort of gendered language that I think carries the same weight as in the Purdue case. Now, with respect to the intake interview, I think once you again, as as the university has argued, once the statements are taken in context and also looked at in the context of the investigation, it becomes more apparent that there was no initial prejudgment. Dr. Krikow admitted in his deposition that the statements were perhaps inartfully worded when he went back and looked at them. But his testimony unequivocally states that he was commenting on the jurisdiction. He was looking at it similar to a district court looking at a motion to dismiss. Is there something there for the university to investigate? And once you look at these statements beyond what was cited by Mr. Johnson, it becomes clear that he says, based on what you're telling us, there's something there. Based on what you're telling us, if what you're telling us is true, there's something for us to investigate. Ms. Tierney, I've got a question. I've got a question about the, and Mr. Binal may choose to comment on it as well. In the discovery process in this case, were there efforts to develop comparator evidence of the way comparator matters were handled? You can approach proof in a case like this a bunch of different ways, and I think that way may be one of them. There's some reference in the summary judgment papers to a comparator case involving student A. That never surfaces in the briefs in our court. And what I was wondering about is what effort the plaintiff made, if any, to approach this from developing comparator evidence. Absolutely. So in the district court proceedings, there was information exchanged about overall the statistics at Marion University with regards to what the outcomes were for various Title IX complaints, both for males and female respondents and male and female complainants. There was some discovery conducted about this student A, and the plaintiff had, in fact, somewhat addressed this at the district court, but it was abandoned on appeal. And that was one of the things that the university had pointed out with respect to an indirect method of proof, which is that by abandoning this comparator argument, the plaintiff can in no way satisfy a prima facie case on appeal for this court and present a full and complete case because they've abandoned their comparator argument. And so I think that issue is kind of a moot point because the plaintiff has appeared to abandon that argument in its entirety. But to answer your question, there was some discovery conducted, and I'm not entirely sure why that issue was abandoned, but it has been. So you think a plaintiff in a case like this. I'm sorry. No, go ahead, Dan. Go ahead. I'm just back to the timing issue. Yeah, I would like to add that the plaintiff had the opportunity to file something like this one year later. It seems when the fiancé got more involved, perhaps he was the one that encouraged her to file a lawsuit. Now, this is mostly a curiosity on my part, because it seems to be a one-year delay. If something is this much of a problem, then it didn't come up a whole lot sooner. And she even mentioned some other encounters that kind of goofed up some other relationship. It's like, yeah, this was some circumstance that happens too often, I suppose. But that's the only curiosity I have, and maybe you don't have an answer for that, why it took so long before this came up and actually a complaint was filed. Certainly, Judge Mannion. So there was some discovery conducted both during the investigation and during the course of this lawsuit after Mr. Johnson filed suit. As it relates to the course of the investigation, as the university noted in walking through the procedure that it conducted during the course of the investigation, there was one witness that was identified by Mr. Johnson, who was purportedly with the complainant and Mr. Johnson the night of the party. And then there were a few individuals, including a friend, a co-worker, and I think a roommate that Ms. Rowe had given to the investigators. And during the course of the investigation, Dr. Krikow and Ms. Harmsen had the same question that you did, Judge, which is there seems to be a delay or a disconnect as to why this was raised a year later. And so those were the additional witnesses that the university went and sought out. They went and sought out individuals from the ROTC program, which is Ms. Rowe had initially made the complaint to somebody in ROTC. And then when they had discussed it, she was encouraged or I shouldn't say she was encouraged. She then went to the university and made a complaint after she had told ROTC. And so the university did look into why there was a delay and whether or not there was any additional information with respect to the delay in the timing. And then as it relates to this lawsuit after Mr. Johnson filed suit, Mr. Johnson's attorneys did question Ms. Rowe during her deposition about the delay and about the relationship and kind of raise some issues about whether or not there was some, I guess, issue with her raising it late. But the fact of the matter is, even with the delay, what this ultimately came down to and what was testified to by Dr. Kreekow and Ms. Harmsen was that the entire case came down to the fact that Mr. Johnson admitted in his first interview that the first thing that he said to the witness or excuse me, the complainant the next morning was, what do you remember? And the issue was not whether or not they had sexual relations. And the issue was what did she say? I don't believe there's anything in well, I shouldn't say I don't believe I can't recall off the top of my head what she said. But I believe Mr. Johnson had said in his interview after he asked that question that she expressed some indication that she didn't remember anything. And that that's where we get to the point of the parties both agree that the next morning they realized she was too drunk. So we know that they had sexual relations and we know the next morning both parties realized that Ms. Rowe was too inebriated. The question ultimately for the investigation became whether or not Mr. Johnson knew at the time that she was too inebriated to consent and his own admission. Well, I'm sorry. It seems that question is dispositive in their decision. It was. And the fact that he asked that. And I mean, that question could be in a friendly way. It could be in a scary way. It could be he doesn't remember anything either or something. Well, that's all. And yet that statement implicated to the decision maker, whatever you want to call it. Well, anyway, that's a side. It's a side issue. And I admit that's only a curiosity for me. So I'm not going to dwell on it since they didn't. They didn't raise it here. Well, I see that I'm over my time, but if I could just comment very briefly. One interruption. Judge Scudder, you were cut off earlier. I'm OK. I'm fine. OK. In that event, thank you very much. The case is taken under advisement. Thank you. Oh, sorry. I can't take the case under advisement yet. I believe Mr. Benall has a minute and 20 seconds or so. Your Honor, thank you very much. And first, as to the comparator evidence that was brought up. There was, in the district court, a discovery done on a comparator. And quite frankly, that's one of those things in litigation where it just doesn't, after discovery, turn out the way that maybe you think it did beforehand. It was not one of our stronger arguments. The other evidence, and that is certainly circumstantial evidence, but as this court held in Ortiz, evidence is evidence, and it must all be weighed together. And that includes the circumstantial evidence. And, for instance, the tweets involving Justice Kavanaugh are something where it was a similar factual situation and are inquisitive of the bias. And the fact that Mr. Johnson said, I don't remember, was because of his surprise. And that's why we believe that was pretextual from the other evidence. We ask the district court to reverse and remand for trial. Thank you very much. Now the case is taken under advisement.